People of the State of Illinois, Plaintiff-Appellee, v. Matthew Wilson, Defendant-Appellant.

Gen. No. 49,639.

First District, Second Division.

September 29, 1964.

William C. Starke and Howard T. Savage, of Chicago (William C. Starke, of counsel), for appellant.

William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney, of Chicago,

Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, Elmer C. Kissane and William J. Nellis, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court:

Matthew Wilson appeals from a judgment on a verdict finding him guilty of obtaining $7,000 from Loney Neal in violation of the Confidence Game Statute (Ill Rev Stats 1961, c 38, § 256) and that he serve not less than seven nor more than ten years in the Illinois State Penitentiary.

On January 14, 1960, Loney Neal was walking southward from Madison Street on State Street in Chicago upon leaving the First Federal Savings and Loan Association where he had just made a deposit to his account. He was confronted by a stranger, whose identity is unknown, hereinafter called the "first man," who told Neal that he was an illiterate legatee from Arkansas and that he was carrying a great deal of money in a money belt around his waist. He asked Neal the location of a Reese Hotel and expressed a desire to see a girl before he returned to Arkansas. Neal replied that he did not know where the Hotel was located and suggested that "first man" consult the telephone directory. At this point, the defendant, Matthew Wilson, also a stranger to Neal, joined the pair. Wilson, a well-dressed, intelligent-looking man, answered that he knew the location of the Reese Hotel and offered to drive "first man" there in his automobile. Wilson asked Neal to escort "first man" to State and Adams Street while he acquired his automobile from a nearby parking lot. When Wilson arrived in the automobile, "first man" entered the rear seat. Neal said he was going home, accepted Wilson's offer to drive him to the south side of Chicago, and entered the front seat.

305

After riding about fifteen minutes, during which time "first man" repeated his desire to see a girl and to go to the Reese Hotel, Wilson drove into a parking lot near 26th and State Streets. Wilson exited, saying that he was going into the hotel to see if he could get a girl for "first man." Upon his return some fifteen minutes later, Wilson stated that a girl would not be available for about fifteen minutes. Neal thereupon left the automobile, saying he was going home. Wilson offered to drive him to 47th Street; Neal again accepted, entered the automobile, exited at 47th Street, and entered the CTA elevated train station. Neal, a CTA employee, spoke to the collector in the station. Wilson, in the meantime, used the telephone and then told Neal that his boss gave him more time. He said he would drive "first man" back to the hotel and would then drive Neal home. Neal again accepted the offer.

While riding in the automobile, Wilson remarked that "first man" had too much money to take into the hotel, to which Neal suggested that Wilson drive "first man" to a bank on 47th Street so that "first man" could deposit his money until he was ready to leave town. "First man" declined to do this, stating that if he deposited his money in a bank a white man's signature would be necessary as a voucher in order to withdraw the money, since this was the custom in Arkansas. Neal stated that "first man" was mistaken, that he, Neal, had just made a deposit at the First Federal, and produced his passbook. Wilson suggested that Neal withdraw his money from First Federal to prove to "first man" that a white man's signature is not a prerequisite to a withdrawal. Neal declined, stating that he did not want to lose the interest on his money, but Wilson assured him that a withdrawal of only a few hours would not result in a loss of interest. Neal decided to withdraw his funds from First Federal in order to protect "first man." "First

306

man" wagered that Neal could not withdraw the money without a white man's signature, and Neal accepted the wager.

The three men returned to the hotel to see if a girl was available, but were informed by a third stranger, whose identity is unknown and who shall be referred to as "third man," that there would be a long delay. Wilson then suggested that they proceed to the First Federal. "Third man" asked if he could accompany them and Wilson said "yes." The four men proceeded to a parking lot near Washington and Dearborn Streets, and Neal started to depart for the First Federal, located at Madison and Dearborn Streets a block away. "First man" said someone should go with Neal to insure that no white man signed for his withdrawal, so "third man" offered to and did accompany Neal.

With "third man" watching, Neal received $7,000 from the bank teller; the money was in $100 bills and bound with a rubber band. Neal placed the money into the pocket of his leather jacket and the two men returned to the automobile, where Wilson and "first man" were playing a game of cards. Wilson asked "third man" if the withdrawal was accomplished and "third man" replied in the affirmative. Wilson then asked Neal if he could see the money and Neal handed it to him. Wilson said, "We'll tie it up in this handkerchief." He proceeded to wrap the money in the handkerchief while the other three men bantered among themselves, and then gave Neal a stuffed handkerchief which Neal placed into the pocket of his jacket. Neal thought that the handkerchief contained both his and "first man's" money. "First man" stated that he did not want Neal carrying his, "first man's," money around in the jacket pocket, removed the bundle from the pocket, unbuttoned Neal's shirt, and shoved the bundle under the shirt.

Wilson then said that he would drive "first man" over to the hotel and suggested that Neal remain in

the loop and meet him at State and Adams Streets. Neal exited within five minutes after his return from the bank.

While proceeding to State and Adams Streets, Neal decided to re-deposit his money at the First Federal since there was no longer any reason to carry it. He removed and opened the handkerchief, only to find strips of paper which fell out. Two plainclothes detectives, Harold Olson and Joseph Senase, observed Neal remove and open the handkerchief from about twenty-five feet away. They observed the paper strips fall out. The two officers conversed with Neal, who then led them to the parking lot at 122 North Dearborn Street which Wilson had just left, where they acquired the license plate number of Wilson's 1960 Cadillac sedan. Neal did not see Wilson again until four days later when he identified Wilson to a policeman at the County Building in Chicago and again later that same day in a multiple lineup at police headquarters.

Defendant Matthew Wilson testified in his own behalf. He stated that he met Neal and "first man" on State Street and agreed to drive them to a hotel to find a girl; "first man" offered to pay Neal and Wilson ten dollars apiece for their trouble. Wilson stated that he drove to 47th Street and South Park where Neal checked on his work schedule and that the three men then drove to 39th and Drexel where he contacted a man ("third man") about some girls. Upon his return to the automobile he found Neal and "first man" engaged in a game of cards. After about forty-five minutes of playing cards, Neal said that he had lost all of his money and then produced his passbook, but "first man" would play only for cash. Wilson stated that Neal asked him to drive him to the First Federal Savings and Loan Association so that he could make a withdrawal, that "first man" objected to his going alone, and that "third man" accompanied Neal to make the withdrawal. Neal re-

308

turned with a large amount of money and proceeded to gamble in the automobile in the parking lot at 122 North Dearborn Street. The gambling continued for about forty-five minutes when two policemen ordered the game to cease. After the policemen left, the game continued for another forty-five minutes when Neal and "first man" began to argue about bets. Neal jumped out of the automobile, saying that he wanted to get even. Wilson said that he drove off when Neal refused to reenter the automobile.

During the course of this two and one-quarter-hour card game, Wilson stated that he had the motor of the automobile running for some time because it was cold that day. He also stated that he knew how to play various card games, but that he was not playing that day because he was short of money. He testified that he was employed as a bartender and made $65 per week.

Wilson denied that he ever received $7,000 from Loney Neal or that he tied $7,000 of Neal's money into a handkerchief; he also denied any conversation about a white man's signature being necessary to withdraw money from a bank.

The manager of the parking lot at 122 North Dearborn Street, Woodrow Waller, also testified for the defense. He stated that he observed the transfer of a white package from Wilson to Neal. Waller testified that he had seen Neal, Wilson, and two other men sitting in an automobile and observed a card game in progress on the day in question, which facts he failed to disclose until May 7, 1962, the opening day of the trial. He also stated that Wilson offered him $100 and, if he had paid, Waller would have told the police nothing.

Defendant contends that the corpus delicti of the crime of obtaining money by use of the confidence game was not established in this case, for the reasons that Wilson was not shown to have obtained and re-

tained possession of the $7,000 nor was he shown to have said or done anything by way of false representations in order to gain Neal's confidence. In the alternative defendant contends that, if the corpus delicti of the crime was established, the evidence fails to establish his guilt beyond a reasonable doubt. We are of the opinion that the evidence sufficiently establishes both a violation of the Confidence Game Statute and defendant's guilt beyond a reasonable doubt.

■■ The sequence and nature of the circumstances of this case warranted a jury to find that Wilson, "first man," and "third man" were engaged in a conspiracy to swindle Loney Neal out of his money. See People v. Jackson, 4 Ill2d 296, 122 NE2d 813. Defendant infers that because no conspiracy was charged in the one-count indictment the acts and statements of "first man" and "third man" cannot be attributed to him. In People v. Niemoth, 409 Ill 111, 98 NE2d 733 the court said (118): "Evidence is admissible to prove a conspiracy to commit the crime with which a defendant is charged although no conspiracy is laid in the indictment; and where a conspiracy is established, every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as an act or declaration of each of them and may be proved against all." Accordingly, Matthew Wilson is chargeable with the acts and statements of "first man" and "third man" as if they were his own.

■ The gist of the crime of obtaining money or property by use of the confidence game is a trust or confidence reposed in the swindler and betrayed by him as a means of obtaining the victim's money or property. People v. Jackson, 4 Ill2d 296, 122 NE2d 813. Wilson gained the confidence of Loney Neal by his own acts and statements and those of his confederate, "first man." Neal was confronted on the public street by an allegedly illiterate southern man who was supposedly in need of help. Defendant Matthew Wil-

son then appeared on the scene, a well-dressed, intelligent-looking man. Playing the part of the "good Samaritan," Wilson offered to help "first man" and to drive Neal home in his new Cadillac automobile, all at no expense to either of them. After spending some time attempting to be of assistance to the two men, Wilson suggested that "first man" was carrying too much money to take into the hotel with himself, prompting Neal to suggest the solution of making a bank deposit. Neal then produced his First Federal passbook after "first man" declined to deposit his money due to an alleged Arkansas savings withdrawal custom. It was then conveniently suggested by Wilson that Neal withdraw his savings from the First Federal to show "first man" that he was mistaken. Neal expressed his reluctance to do so, for fear of losing interest on his money, but Wilson falsely assured him that a withdrawal for only a few hours would not result in a loss of interest. Neal then thought to himself, "to keep this guy from losing his money, and everything like that, I believe I will do it for him." Neal withdrew the money, expressing by overt act his desire to help "first man." This sympathy felt by Neal for "first man" is the same type of trust as was reposed by the victim in the defendant in the case of People v. Weil, 243 Ill 208, 90 NE 731, where the defendant borrowed money from the victim under the pretense of having lost his wallet and of being a friend of the victim's friend. Neal's trust in "first man" was again manifested by his allowing "first man" to remove the handkerchief which he thought contained his and "first man's" money, from his jacket pocket to the inside of his shirt. Any confidence or trust reposed in "first man" by Neal is imputed to Wilson by virtue of the conspiracy. Loney Neal's trust in Wilson is manifested by his allowing Wilson to handle the $7,000 and to wrap it up in the handkerchief; Neal testified that he thought the mon-

ey would be returned to him. The final indication of Neal's trust in Wilson and "first man" was his willingness to leave the automobile and later meet Wilson at State and Adams Streets with "first man's" money.

Defendant points out that Loney Neal stated on cross-examination that he did not have confidence in "first man" and was not interested in him. However, these statements must be considered in the manner and context in which the jury heard them:

> "Q. Would it be fair to say you got in the car because of your sympathy for the man with the money belt on?
>
> "A. Sympathy?
>
> "Q. Yes. You were interested in that particular man, the man who had the money belt?
>
> "A. I wasn't interested in no man, at all.
>
> "Q. Didn't you say you felt sorry for him?
>
> "A. I felt sorry for him, but that doesn't make me interested in him. I felt sorry for him because, as I said, he didn't have no education. He had this money in his belt and everything, and I didn't want him to get robbed.
>
> "Q. You didn't have confidence in him, did you?
>
> "A. I didn't know anything about it, no.
>
> "Q. You didn't have trust in him?
>
> "A. I didn't know whether he was telling the truth or not.
>
> "Q. Will you answer my question?
>
> "A. Oh, no, I didn't have no trust, if that's the way you want it.

312

"Q. You didn't have trust in this man, did you?

"A. No, I didn't know anything about either of them."

What exactly Neal meant and how he meant it was a question for the jury, not for this court. Based on the evidence presented in this case, the jury could reasonably have found that Neal had reposed trust in "first man," but that he was unable to comprehend the meaning of "confidence" when the questions were presented to him on cross-examination.

Whether the switch of handkerchiefs was made by Wilson or by "first man" is immaterial; as a conspirator Wilson is responsible for the acts of his confederates in carrying out the conspiracy.

Defendant suggests that the loss of the money was the result of larceny on the part of "first man," the person who last had possession of the handkerchief. Neal, however, voluntarily parted with possession of the handkerchief by permitting "first man" to remove the bundle from his pocket into his shirt. If this is when the switch occurred, it is nothing more than the final step in the swindle; the removal from the pocket resulted from misplaced confidence and voluntary parting of possession.

■ Defendant's alternative contention, that the evidence is not of such clear and convincing nature as to establish his guilt beyond a reasonable doubt, ignores the fact that it is within the province of the jury, as the trier of fact, to believe certain witnesses and disbelieve others. People v. Arnold, 27 Ill2d 294, 189 NE2d 241. Viewing the evidence given by Loney Neal, and corroborated by Officer Olson as to the handkerchief full of paper strips and by defendant's witness, Woodrow Waller, as to the passage of a white package from Wilson to Neal, we cannot say that a reasonable doubt exists as to the guilt of Matthew

Wilson. The case of People v. Gair, 379 Ill 458, 41 NE 2d 502, cited by defendant in support of his request for reversal on this point, differs substantially from the case at bar. In the Gair case several glaring deficiencies in the People's evidence as to the fraudulent scheme, the obtaining and abusing the confidence of an allegedly mentally incompetent person, among other factors, prompted the court to reverse defendant's conviction because his guilt was not established beyond a reasonable doubt. In the case at bar, however, we are of the opinion that the evidence does establish defendant's guilt beyond a reasonable doubt. Wilson's convenient appearance on the scene, his zealous desire to be of assistance to two complete strangers, Neal and "first man," at no expense to either, his convenient suggestion that Neal withdraw his funds and his false statement as to the interest loss, his subsequent wrapping of the money into a handkerchief creating a bundle of similar size and appearance to the one full of paper: in short, defendant's deep involvement in the entire situation eliminates any reasonable doubt upon which he may rely for reversal.

The judgment is affirmed.

Judgment affirmed.

FRIEND and BRYANT, JJ., concur.